UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

FRANKIE WILLIAMS,

                                    Plaintiff,

            vs.                                                        1:23-cv-1212
                                                                       (ECC/DJS)

SEAN TASHJIAN, Individually, and
TYLER MOFFATT, Individually,
                                    Defendants.

---

**Appearances:**

Brett H. Klein, Esq., *for Plaintiff*
Erin Mead, Asst. Att'y General, *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

Plaintiff Frankie Williams filed this action against New York State Police (State Police) investigators Sean Tashjian and Tyler Moffatt (Defendants) pursuant to 42 U.S.C. § 1983 alleging constitutional violations arising out of his February 11, 2020 detention and subsequent prosecution.  Dkt. No. 1.  He alleges false arrest, unlawful strip search, malicious prosecution claims, and fair trial claims against both Defendants.  *Id.*  Presently before the Court are Defendants' motion for partial summary judgment and unopposed motion to seal, as well as Plaintiff's motion for leave to file a surreply.  Dkt. Nos. 47, 48, 55.  The motions are fully briefed. Dkt. Nos. 47-25, 48, 51, 54-4, 55, 56.  For the following reasons, Defendants' motion for partial summary judgment is granted in part and denied in part, Defendants' motion to seal is granted, and Plaintiff's motion for leave to file a surreply is granted in part.

## I.    BACKGROUND[1]

Given the different versions of events offered by the parties, the facts are provided separately for each party.

### A. Plaintiff's Facts

In July 2019, the State Police began investigating a man, "Pops," for selling cocaine, but Plaintiff was not a specific subject until February 2020. Pl. Resp. ¶¶ 1, 3.  Between July 2019 and February 2020, a confidential informant (the informant) purchased cocaine from "Pops." Def. Stat. ¶ 4; Pl. Resp. ¶ 4.  Plaintiff was not "Pops," and he never used that name.  Pl. Stat. ¶¶ 1, 2.  The only evidence that Plaintiff was "Pops" was an identification by the informant relying on a single photograph of Plaintiff "from when he was much younger" that "was not consistent with [his] appearance at the time."  Pl. Resp. ¶ 4.  At some point, Plaintiff obtained a statement written by the informant stating, "I know that Franky Does not sell any kind of narcotics[.] When I was at [illegible] Franky gave me $20 for gas[.] He has never ever sold any kind of narcotics as of m[illegible] knowledge."  Pl. Resp. ¶ 3; *see* Dkt. No. 51-5.[2]  The record contains no information about when the informant wrote this note.

The parties agree that on August 26, 2019, a court issued a warrant to install a tracking

---

[1] The following facts are drawn from the Defendants' Statement of Material Facts (Def. Stat.), Dkt. No. 47-24, Plaintiff's Response to Defendants' Statement of Material Facts (Pl. Resp.) and Plaintiff's Counter Statement (Pl. Stat.), Dkt. No. 51-1, and the exhibits that the parties have submitted, to the extent that they present facts that may be presented in a form that would be admissible as evidence.  Unless otherwise noted, citations to page numbers refer to pagination generated by ECF system.

[2] Defendants object to this statement because it lacks foundation and is not a sworn statement. Dkt. No. 54 ¶ 14; Dkt. No. 56 at 1.

device on Plaintiff's car, but the tracking device was not installed because law enforcement did not find Plaintiff's car within the time allowed by the warrant. Def. Stat. ¶¶ 5, 6. The parties also agree that on February 11, 2020, a court issued a search warrant for Plaintiff's person and his vehicle, and on the same day that the search warrant was issued, Plaintiff was stopped while he was in a vehicle. [3] *Id.* at ¶¶ 7, 8.

Two members of the Sheriff's Department got out of their car and one, who approached with his gun drawn, told Plaintiff to put his hands up. Pl. Stat. ¶ 7. Plaintiff complied. *Id.* He was removed from his vehicle and handcuffed. *Id.* at ¶ 8. The Sheriff's vehicle that stopped Plaintiff had an onboard camera, but it did not record the stop. *See id.* at ¶ 9; Dkt. No. 51-8 at 2:15–4:6 (state trial testimony explaining that the camera should have been activated by the emergency lights, but the camera did not capture the stop).

Moffatt, who observed the stop from an unmarked vehicle, searched Plaintiff near the rear driver's side of his car. Def. Stat. ¶ 9; Pl. Stat. ¶ 10. Moffatt "grabbed" Plaintiff's "butt in a manner which was not consistent with a search and made [Plaintiff] uncomfortable." Pl. Stat. ¶ 10. Plaintiff "did not have narcotics on him at all." *Id.* at ¶ 12. A trained police dog searched the car, including the front passenger seat where Plaintiff had been sitting, and walked "within a couple of

---

[3] Although Plaintiff's statement of undisputed facts states that he "had been sitting" in the front passenger seat before the stop, he does not provide any support for that assertion. Pl. Stat. ¶ 13 (Plaintiff "had been sitting" in front passenger seat). Plaintiff previously testified that he was driving. Exhibit O to Mead Decl., Dkt. No. 47-16 at 50:18–22 ("I was driving on Fairview and the sheriff is behind me and he had the sirens on and I pulled it over. He pulled over behind me, two cars in front of me. Me, two other cars, we pulled over. I thought they was going by, but came behind me."); Dkt. No. 51-8 at 23:2–10 ("As you were taken away from your vehicle location, could you -- were you able to witness the canine going into your car? A. Yeah. Q. How did the dog -- A. In the front seat -- the driver seat of my vehicle. Q. That's where you were sitting; correct? A. That's where I was sitting.").

3

feet" of Plaintiff, but did not alert. Pl. Stat. ¶ 13.

Tashjian arrived and made "repeated statements about going in [Plaintiff's] ass." Pl. Stat. ¶ 14. The State Police took Plaintiff in handcuffs to a State Police barracks. *Id.* at ¶ 15. During the drive, Tashjian continued to make "comments about going into [Plaintiff's] ass and was grabbing and fondling [Plaintiff's] buttocks area in the vehicle." *Id.*

Defendants searched Plaintiff in a private room at the barracks, by asking him to remove his clothes then "to squat three times." Pl. Stat. ¶ 16; Def. Stat. ¶¶ 35, 38. No controlled substances were recovered from this search, and Plaintiff saw no controlled substances. Pl. Stat. ¶¶ 17–18. After the search, Defendants did not read Plaintiff his *Miranda* rights or question him about illegal drugs, but they asked him to become a confidential informant. *Id.* at ¶ 19. Moffatt told Plaintiff that he would be released, left the room, and returned with a written statement explaining that police seized two phones and cocaine from Plaintiff. *Id.* at ¶¶ 21–22. Plaintiff refused to sign the statement because he had one phone and no cocaine. *Id.* at ¶ 22. Plaintiff was "released without any charges." *Id.* at ¶ 23. The parties do not dispute that Tashjian did not discuss whether to charge Plaintiff with Moffatt or how Plaintiff's case should proceed. Def. Stat. ¶¶ 59–60.

A report signed by Moffatt states that police seized two cell phones and a bag of "an off-white chunky substance" believed to be crack cocaine from Plaintiff. Dkt. No. 51-4 at 5–6. This report, records, and evidence allegedly seized from Plaintiff were provided to a prosecutor. Pl. Stat. ¶ 24.

The parties agree that Defendants testified before a grand jury on December 2, 2020. Def. Stat. ¶ 64. On December 9, 2020 the grand jury indicted Plaintiff for criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the

4

fourth degree.  Def. Stat. ¶ 66.  The next day, an arrest warrant was issued for Plaintiff, and Plaintiff was arrested on January 8, 2021.  *Id.* at ¶¶ 67–68.  After a trial, a jury acquitted Plaintiff on all counts.  Pl. Stat. ¶¶ 26–27; Def. Stat. ¶¶ 70, 74.

### B. Defendants' Facts

In July 2019, Plaintiff became the subject of a State Police investigation assigned to Moffatt, an investigator with the State Police's Violent Gangs Narcotics Enforcement Team.  Def. Stat. ¶¶ 1–2.  The informant told Moffatt that Plaintiff was selling cocaine.  *Id.* at ¶ 3.  In addition, the informant purchased cocaine from Plaintiff four times under controlled circumstances between July 2019 and February 2020.  *Id.* at ¶ 4.  Before the last transaction occurred on February 5, 2020, laboratory tests showed that the substances purchased by the informant during the first three transactions tested positive for cocaine, and a field test for the February 5, 2020 transaction was positive for cocaine.  Exhibit F to Mead Decl. at 19, 27, 40, 46, Dkt. No. 47-7.  The cocaine was sold out of a Jeep registered in Plaintiff's name.  *Id.* at 13, 22, 34, 47; Exhibit A to Mead Decl. at 1, Dkt. No. 47-2; Exhibit P to Mead Decl. at 50:14–21, 51:8–13, Dkt. No. 47-17.

On February 11, 2020, a marked Columbia County Sheriff's vehicle stopped Plaintiff's Jeep, while Moffatt "observed."  Def. Stat. ¶ 9.  Tashjian arrived to help execute the search warrant.  *Id.* at ¶ 10.  During the stop, Plaintiff got out of his Jeep, stood behind it, and in front of the marked car.  *Id.* at ¶ 11.

Both Moffatt and Tashjian searched Plaintiff.  Def. Stat. ¶ 12.  When Moffatt "attempted to search [Plaintiff's] groin and buttocks area," Plaintiff "pulled away, tightened his buttocks and went up on his tip toes."  *Id.* at ¶¶ 13, 14.  During Tashjian's search Plaintiff was "uncooperative" and "would not stand still, kept moving his body away, and was yelling and cursing."  *Id.* ¶ 15. In

5

addition, when Tashjian tried to search Plaintiff's "groin and buttocks area," he "clenched" his buttocks and "legs together," went "on tip-toes[,] and pulled away." *Id.* at ¶ 16. Plaintiff "acted agitated and nervous at the scene and was uncomfortable with the search of his person admitting that he thwarted Inv. Tashjian's attempts to search him." *Id.* at ¶ 17. Moffatt also searched Plaintiff's Jeep, but he did not find any "drugs or other contraband." *Id.* at ¶¶ 18–19.

Based on their "training and experience," Defendants believed that Plaintiff was concealing something in his "groin/buttock area." Def. Stat. ¶ 20. They concluded that there "was reasonable suspicion and cause to bring Plaintiff to the nearest barracks for a strip search" because they believed that Plaintiff "was hiding something under his clothing." *Id.* at ¶ 21. Plaintiff was told that "he was being taken to the barracks for a strip search." *Id.* at ¶ 22.

A State Police trooper drove Plaintiff to a barracks in a marked car, and he was taken to a private room for the strip search. Def. Stat. ¶¶ 23, 35. As required by State Police policy, Defendants were both present for the search, and it was not filmed or photographed. *Id.* at ¶¶ 26–34, 36–37. Plaintiff was asked to remove his clothes "one article at a time," and Defendants searched the clothes. *Id.* at ¶¶ 38–39. After Plaintiff removed his clothes, Defendants directed him to squat with his back to them. *Id.* at ¶ 40. When Plaintiff squatted, they saw a plastic bag between his buttocks. *Id.* at ¶ 41. Defendants asked Plaintiff to remove the bag, and he did. *Id.* at ¶ 42. Neither Defendant touched Plaintiff. *Id.* at ¶ 43.

The bag "contained a white chunky substance," and a field test was positive for cocaine. Def. Stat. at ¶¶ 44, 45. Moffatt took the bag "into custody and secured [it] as evidence." *Id.* at ¶ 46. After the bag was labeled and photographed, it was placed in a "locked drop safe at the barracks and transferred" to a police crime lab for testing the next day. *Id.* at ¶¶ 47–48. Moffatt's

6

incident report noted the seizure of the bag. *Id.* at ¶ 49.

After the strip search, Defendants discussed the possibility of Plaintiff becoming a confidential informant, but the conversation ended quickly because neither Defendants nor Plaintiff were interested. Def. Stat. ¶¶ 50–51. Moffatt contacted a prosecutor explaining that "no contraband was recovered during the search" of Plaintiff's car or the initial "search of his person, but that a plastic bag believed to contain . . . cocaine was recovered during a strip search." *Id.* at ¶¶ 52–53. The prosecutor "instructed" Moffatt to release Plaintiff "pending lab results." *Id.* at ¶ 55. Plaintiff was released, and told that he could be arrested in the future depending on the lab results. *Id.* at ¶ 58.

Tashjian did not speak with the prosecutor on February 11, 2020; he did not discuss whether to charge Plaintiff or how the case should proceed; and he did not process evidence seized during the strip search. Def. Stat. ¶¶ 56–57, 59–61. "Due to delays caused by COVID-19," the lab results indicating that the substance tested positive for cocaine were not provided until October or November 2020. Def. Stat. ¶ 62. According to a report written by Moffatt on November 30, 2020, as of that date, "all evidence" had reached its "final destination, all lab reports" had "been received," and "all case paperwork ha[d] been submitted to" the prosecutor. No. 51-4 at 7. After receiving the lab results, Defendants testified before a grand jury on December 2, 2020. *Id.* at ¶ 64. Tashjian never talked to the prosecutor about Plaintiff before his grand jury testimony. *Id.* at ¶ 65.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and

7

that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation and quotation omitted); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250 (citation and quotation omitted); *see Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

8

475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Further, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## III.    DISCUSSION

The complaint alleges the following claims under § 1983: (1) false arrest, (2) unlawful strip search, (3) malicious prosecution, (4) fair trial violation, and (5) failure to intervene.  Dkt. No. 1.

### A.    Plaintiff's Surreply

Plaintiff filed a motion seeking permission to file a surreply, or in the alternative asking the Court to consider his submission as a surreply.  Dkt. No. 55 at 1.  Plaintiff argues that a surreply is appropriate to respond to Defendants' objection that the informant's written statement was not produced in discovery and to provide a declaration regarding events before the strip search.  Dkt. *Id.* at 1–2.  Defendants oppose the motion arguing that the new declaration is untimely and inconsistent.  Dkt. No. 56 at 1–2.  They also withdrew their discovery objection to the informant's statement.[4]  *Id.* at 1.

Plaintiff's filing is accepted as a surreply to the extent that it clarifies that Plaintiff complied with his discovery obligations, but it is denied to the extent that Plaintiff seeks leave to file additional briefing and introduce a new declaration.  Plaintiff has not offered any reason why he

---

[4] Defendants did not withdraw their other objections to this evidence.  Dkt. No. 56 at 1.

did not file this declaration with his initial response to the partial motion for summary judgment. "Sur-replies are the exception, not the rule, and are not a mechanism for shoring up arguments previously made with evidence not previously submitted." *Polidoro v. L. Firm of Jonathan D'Agostino, P.C.*, No. 19-cv-1290, 2022 WL 20596709, at *5 (S.D.N.Y. May 19, 2022). Accordingly, the attached declaration will not be considered for purposes of Defendants' partial summary judgment motion.

### B.    Motion For Partial Summary Judgment

Defendants seek partial summary judgment on Plaintiff's claims.  Specifically, they seek dismissal of Plaintiff's false arrest, unlawful strip search, and malicious prosecution claims against both Defendants, and dismissal of Plaintiff's fair trial and failure to intervene claims against Tashjian.  Defendants' Memorandum of Law (Def. Mem.) at 3, Dkt. No. 47-25.

### 1.    False Arrest

Plaintiff's false arrest claim relies on his January 8, 2021 arrest (the 2021 arrest) and his February 11, 2020 detention (the 2020 detention).  Dkt. No. 1 ¶ 27.

### a.    2021 Arrest

Defendants argue that the 2021 arrest was pursuant to a warrant.  Def. Mem. at 19.  Plaintiff does not contest dismissal of the portion of the false arrest claim relying on the 2021 arrest, but "not for the reasons argued by defendants."  Pl. Mem. at 17 n.2 (citation omitted).  Instead, he acknowledges that his "arrest was post-indictment" and "his claims arising therefore sound in malicious prosecution, not false arrest."  Pl. Mem. at 17 n.2.

The "existence of an arrest warrant . . . vitiates any claim of false arrest." *Soberanis v. City of New York*, 244 F. Supp. 3d 395, 400 (S.D.N.Y. 2017) (citing *Jenkins v. City of N.Y.*, 478 F.3d

76, 85 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest. . . .") and *Johnson v. Pugh*, No. 11-cv-385, 2013 WL 3013661, at *3 (E.D.N.Y. June 18, 2013) ("Where an arrest is made pursuant to a warrant, a plaintiff cannot make the essential showing that defendant confined him without justification; thus, there can be no claim for false arrest under § 1983."). Given that Plaintiff does not contest dismissal of the portion of the false arrest claim relying on the 2021 arrest, and the case law supports such dismissal, Defendants' motion for summary judgment is granted as to the portion of the false arrest claim relying on the 2021 arrest.

### b. 2020 Detention

Defendants argue that Plaintiff's actions after the stop including his lack of cooperation, the involvement of his Jeep during the controlled transactions, and the informant's identification of Plaintiff provided probable cause to arrest him and reasonable suspicion to detain him to conduct a strip search. Def. Mem. at 12–13, 15; Defendants' Reply (Reply) at 6–8, Dkt. No. 54-4. In the alternative, Defendants argue that they are entitled to qualified immunity because they had arguable probable cause to detain Plaintiff. Def. Mem. at 18. Plaintiff responds that Defendants lacked probable cause to arrest when he was taken to the barracks in 2020. Pl. Mem. at 10–11.

To establish a § 1983 claim for false arrest, a plaintiff must demonstrate that: (1) "the [o]fficers intended to confine" him, (2) he was "conscious of the confinement and did not consent to it," and (3) "the confinement was not otherwise privileged." *Berg v. Kelly*, 897 F.3d 99, 106 (2d Cir. 2018) (citing *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003)). "Probable cause to arrest is a complete defense to a false arrest claim." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citing *Ashley v. City of N.Y.*, 992 F.3d 128, 136 (2d Cir. 2021)).

11

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006) (quotation and citation omitted). Probable cause does not require that the "belief that a person has committed a crime be correct or more likely true than false." *Mara v. Rilling*, 921 F.3d 48, 69 (2d Cir. 2019) (quotation and citation omitted). "It requires only facts sufficient to establish the sort of fair probability on which reasonable and prudent people, not legal technicians, act." *Id.* (quotation and citation omitted).

"To determine whether an officer had probable cause for an arrest," courts "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)) (additional quotation and citation omitted). Probable cause "depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371.

It is also "well established that a police officer aware of facts creating probable cause to suspect a prima facie violation of a criminal statute is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Garcia v. Does*, 779 F.3d 84, 93 (2d Cir. 2014) (quotation and citation omitted). Additionally, evidence "need not be admissible at trial in order to support a finding of probable cause," *Stansbury v. Wertman*, 721 F.3d 84, 91 (2d Cir. 2013) (quotation and citation omitted), and probable cause for a warrantless arrest, may rely on inadmissible evidence, *see Draper v. United States*, 358 U.S. 307, 311 (1959) (rejecting argument that hearsay evidence could not be considered when deciding whether there was probable

cause because it would not be admissible in a criminal trial).  The "subjective reason for making [an] arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).  "Stated differently, 'a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest.'"  *Berg*, 897 F.3d at 111 (alteration in original) (quoting *Jaegly*, 439 F.3d at 154).

Further, when "making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (quotation and citation omitted).  "The determination of probable cause does not turn on whether the fellow [officer's] observations were accurate but on whether the arresting [officer] was reasonable in relying on those observations." *Id*. (quotation and citation omitted).  Finally, "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (alteration in original) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)).

Here, even taking the facts in the light most favorable to Plaintiff, there was probable cause to arrest based on the evidence of Plaintiff's involvement in cocaine sales.  Moffatt knew that an informant purchased cocaine from "Pops" four times under controlled circumstances between July 2019 and February 2020 and that laboratory tests showed that the substances purchased by the informant tested positive for cocaine.[5]  Exhibit F to Mead Decl., Dkt. No. 47-7 at 13, 19, 22, 27,

---

[5] To the extent that Moffatt and Tashjian did not have first-hand knowledge of any of these facts, that is not required, because even if facts were not communicated to them, the knowledge of the

13

34, 40, 46, 47.  In addition, "Pops" used a Jeep registered in Plaintiff's name, and Plaintiff was in that Jeep when he was arrested in February 2020.  Exhibit A to Mead Decl. at 1, Dkt. No. 47-2; Exhibit F to Mead Decl. at 13, 22, 34, 47, Dkt. No. 47-7; Def. Stat. ¶¶ 5, 9.  Finally, the informant identified "Pops" as Plaintiff after reviewing a photograph of Plaintiff.  Exhibit P to Mead Decl. at 81:21–84:8, Dkt. No. 47-17.

These facts were sufficient to establish probable cause for state crimes including, for example, possession of a controlled substance in the fifth degree.  That crime requires that a person knowingly and unlawfully possess "a controlled substance with intent to sell it."  N.Y. Penal Law § 220.06(1).  Cocaine is a controlled substance for criminal possession.  N.Y. Penal Law § 220.00(5); N.Y. Pub. Health Law § 3306(II)(b)(4).

Plaintiff challenges the identification because (1) the photograph shown to the informant was taken when Plaintiff was much younger, and (2) the informant wrote that Plaintiff did not sell any kind of narcotics.  Pl. Mem. at 15; *see* Pl. Resp. ¶¶ 3, 4; Dkt. No. 51-5.  Regarding the photograph even an "undoubtedly suggestive" one-photo identification can contribute to probable cause.  *Mara*, 921 F.3d at 75.  The "critical question for 'determining whether an identification can support probable cause,' is not whether the identification procedure was suggestive, but whether it was 'so defective' that, as a matter of law, 'probable cause could not reasonably be based on it.'"  *Id.* (quoting *Stansbury*, 721 F.3d at 91 n.7) (additional quotation omitted).  Plaintiff has not offered any evidence that the informant "was coerced into identifying the plaintiff," or that

---

other State Police troopers is presumed to be shared by Defendants.  *See Panetta*, 460 F.3d at 395 (officers may rely on allegations of fellow officers); *Savino*, 331 F.3d at 74 (knowledge of one officer is presumed shared by all when they are cooperating).

Defendants believed that the confidential witness had a motive to lie. *Stansbury*, 721 F.3d at 91 n.7. As a result, even if the identification procedure were improper, it would not be "so flawed that [it] could not contribute to a finding of probable cause." *Id.* Regarding the statement, even assuming that it is in a form that could be admissible, Plaintiff offered no evidence that the informant made the statement before the arrest, and probable cause is determined on the basis of "the events leading up to the arrest," not subsequent developments. *Wesby*, 583 U.S. at 56 (quotation and citation omitted).

Furthermore, although it is possible that someone other than Plaintiff used his car during the transactions and that the identification was incorrect, police officers are not required to "explore and eliminate" such "theoretically plausible claim[s]" before arrest when they are "aware of facts creating probable cause to suspect a prima facie violation of a criminal statute." *Garcia*, 779 F.3d at 93 (quotation and citation omitted). Accordingly, Defendants had probable cause to arrest Plaintiff for state crimes including, for example, criminal possession of a controlled substance in the fifth degree, and summary judgment is granted on Plaintiff's false arrest claims.

In the alternative, even if Defendants lacked probable cause, they had arguable probable cause and are therefore entitled to qualified immunity. An officer "is entitled to qualified immunity against a suit for false arrest if he can establish that he had arguable probable cause to arrest the plaintiff." *Garcia*, 779 F.3d at 92 (quotation and citation omitted). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quotation and citation omitted).

Even if probable cause did not exist, there was arguable probable cause because officers of

reasonable competence could disagree about whether there was probable cause where (1) an informant purchased cocaine from "Pops" four times under controlled circumstances between July 2019 and February 2020 and laboratory tests showed that the substances purchased by the informant tested positive for cocaine, Pl. Stat. ¶ 4; Exhibit F to Mead Decl. at 13, 19, 22, 27, 34, 40, 46, 47, Dkt. No. 47-7, (2) "Pops" used a Jeep registered in Plaintiff's name, and Plaintiff was in that Jeep when he was arrested in February 2020, Exhibit A to Mead Decl. at 1, Dkt. No. 47-2; Exhibit F to Mead Decl. at 13, 22, 34, 47, Dkt. No. 47-7; Def. Stat. ¶¶ 5, 9, and (3) the informant identified "Pops" as Plaintiff after reviewing a photograph of Plaintiff, Exhibit P to Mead Decl. at 81:21–84:8, Dkt. No. 47-17.  Defendants are therefore, in the alternative, entitled to qualified immunity on Plaintiff's false arrest claims.

### 2.  Unlawful Search

Defendants argue that they are entitled to summary judgment on Plaintiff's claim for an unlawful search because they had reasonable suspicion that he possessed drugs based on (1) the facts establishing probable cause that he sold cocaine to the informant, (2) the absence of any cocaine in his Jeep, and (3) his behavior immediately after his 2020 stop, that is, interfering with the frisks.[6]  Def. Stat. at 15–16.  Plaintiff responds by challenging these facts, arguing that the controlled transactions with "Pops" have limited relevance, and pointing out that no drugs were seized from his Jeep.  Pl. Mem. at 14–15.

As an initial matter, the parties agree that Plaintiff was asked to squat.  Def. Stat. ¶ 40; Pl.

---

[6] Defendants do not argue that the February 2020 search warrant authorized this search.  *See* Def. Mem. at 16 (describing this search as in compliance with State Police policy for "warrantless strip searches").

Resp. ¶ 40. It therefore appears that he was subject to both a strip search and a visual body cavity search. "[A] 'strip search' occurs when a suspect is required to remove his clothes" while "a 'visual body cavity search' is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked). . . ." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013).

"[A] visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by 'a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity.'" *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019) (quoting *People v. Hall,* 10 N.Y.3d 303, 311 (2008)). "The reasonable suspicion standard is not high," *United States v. Weaver*, 9 F.4th 129, 140 (2021) (en banc) (quotation and citation omitted), but still requires more than "inchoate and unparticularized suspicion" or a "hunch," *Terry v. Ohio*, 392 U.S. 1, 27 (1968). There must be "'specific and articulable facts which, taken together with rational inferences from those facts' . . . provide a 'particularized and objective basis'" for the search. *United States v. Patterson*, 25 F.4th 123, 136 (2d Cir. 2022) (quoting *Terry*, 392 U.S. at 21 and *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). In other words, "[t]o determine whether an officer had reasonable suspicion to justify" a visual body cavity search, the court "'must look at the totality of the circumstances' to see if the 'officer ha[d] a particularized and objective basis for suspecting legal wrongdoing.'" *Sloley*, 945 F.3d at 43 (quoting *Arvizu*, 534 U.S. at 273).

Considering the totality of the circumstances here, a jury must decide genuinely disputed material facts about actions taken by both Plaintiff and Defendants before he was transported to the barracks for the search. Viewing the evidence in the light most favorable to Plaintiff, Moffatt

17

"grabbed" Plaintiff's "butt," and Plaintiff "moved." Dkt. No. 51-8 at 20:13–17. Regarding that movement, Moffatt denies taking any action that would cause Plaintiff to move, such as an inappropriate touching, and Moffatt takes the position that Plaintiff "kind of pulled away from me a little bit. " Exhibit P to Mead Decl. at 110:6–113:6, Dkt. No. 47-17. Viewing the evidence in the light most favorable to Plaintiff, Plaintiff was "upset," "mad," and did not "feel comfortable with another man touching any private part of [his]." Dkt. No. 51-8 at 21:4–17; *see also id.* ("I reacted, like anyone would react. If somebody that you don't consent to touch your buttocks – I was angry. And I was trying to move – asking them, like, you know, like I felt uncomfortable, very uncomfortable. That's not a comfortable thing, another man touching my butt."). Finally, viewing the evidence in the light most favorable to Plaintiff, when Tashjian arrived at the scene, he said, "I'm going in your ass." Dkt No. 51-8 at 22:1–6. Resolution of these facts—whether Moffatt grabbed Plaintiff's buttock and, if so, whether that was lawful because, for example, it was authorized by the search warrant for Plaintiff's person, whether that action caused Plaintiff to pull away, how much Plaintiff pulled away, and whether Tashjian made such a statement—is necessary to decide whether Defendants had reasonable articulable suspicion for the strip and visual body cavity search.

Defendants point to the lack of controlled substances in Plaintiff's Jeep as a factor contributing to reasonable suspicion. Def. Mem. 15. But the underlying assumption—that Plaintiff would have contraband—is not strong here given that the last controlled transaction occurred the week before Plaintiff's arrest. The cases Defendants cite are therefore distinguishable because, unlike here, those cases involved strong evidence that the suspect was carrying contraband. *See, e.g.*, *Chambers v. Lombardi*, No. 17-cv-7557, 2020 WL 2097558, at *9

18

(S.D.N.Y. May 1, 2020) (considering, as one factor contributing to reasonable suspicion for a strip search, that officers did not find drugs in the vehicle along with other actions taken by officers plaintiff to what, according to electronic surveillance, was the site of a likely drug deal, received inconsistent answers from plaintiff regarding his travel that they knew were incorrect, and learned that police dogs alerted for the presence of drugs in Plaintiff's vehicle); *United States v. Gonzalez*, No. 08-cr-363, 2009 WL 613201, at *1, 7 (S.D.N.Y. Mar. 4, 2009) (same where officers did not recover weapons from defendant at the scene of a planned armed robbery, but where "officers believed, based on information they received from a CI, that the suspected robbers would be armed," and defendant's "agitation and refusal to cooperate with the strip search and the bagginess of his clothing strengthened an already reasonable suspicion that his person contained additional evidence of criminality"), *aff'd*, 441 F. App'x 31 (2d Cir. 2011), and *aff'd*, 470 F. App'x 2 (2d Cir. 2012); *Bradley v. Vill. of Greenwood Lake*, 376 F. Supp. 2d 528, 530, 536 (S.D.N.Y. 2005) (same where officers did not recover heroin, plaintiff fled into the woods where he hid from police for approximately five to seven minutes and this all occurred approximately 30 minutes after officers received a tip that plaintiff possessed heroin and that he was trying to sell it to minors). Therefore, when considering the totality of the circumstances a reasonable jury could conclude that there was not reasonable suspicion for the strip and visual body cavity search.

The same genuinely disputed facts preclude qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "To be clearly established, a right must be sufficiently clear that every 'reasonable official would [have

19

understood] that what he is doing violates that right.'" *Id*. (quoting *al-Kidd*, 563 U.S. at 741) (additional quotations omitted). "Pretrial resolution of the defense of qualified immunity may be thwarted by a factual dispute." *Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) (quoting *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir. 1990) (cleaned up).

Given the factual disputes previously discussed—whether Moffatt grabbed Plaintiff's buttock and, if so, whether that action was lawful because, for example, it was authorized by the search warrant for Plaintiff's person, how much Plaintiff pulled away, and whether Tashjian said, "I am going in your butt,"—pretrial resolution of qualified immunity is not possible. Accordingly, summary judgment is denied on Plaintiff's unlawful search claim.

### 3. Malicious Prosecution

#### a. Probable Cause to Prosecute

Defendants argue that they are entitled to summary judgment on Plaintiff's malicious prosecution claim because there was probable cause to prosecute Plaintiff for the crimes charged in the indictment, and that the indictment creates a presumption of probable cause. Def. Mem. at 22–23. Plaintiff responds that he has rebutted the presumption of probable cause created by the indictment with evidence that Defendants did not recover any controlled substances from him. Pl. Mem. at 18–19. Defendants reply that Plaintiff relies solely on his own testimony to rebut the presumption of probable cause, and that is not sufficient. Reply at 14–15.

To establish a malicious prosecution claim, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d

Cir. 2010) (quotations and citations omitted).  A § 1983 malicious prosecution claim also requires a plaintiff to "demonstrate a 'sufficient post-arraignment liberty restraint.'"  *Kee v. City of New York*, 12 F.4th 150, 162 (2d Cir. 2021) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

The "existence of probable cause is a complete defense to a malicious prosecution claim." *Cornelio v. Connecticut*, 32 F.4th 160, 178–79 (2d Cir. 2022).  Probable cause to prosecute must be shown "for each crime charged," and therefore "should not be conflated with probable cause to arrest."  *Kee*, 12 F.4th at 166 (citing *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)); *see Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024) (explaining that "courts should evaluate" malicious prosecution suits "charge by charge").

"[I]ndictment by a grand jury creates a presumption of probable cause. . . ."  *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).  "That presumption may be rebutted only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'"  *Manganiello*, 612 F.3d at 162 (quoting *Savino*, 331 F.3d at 72) (additional quotation omitted).  In other words, "[w]here there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome."  *Id.* (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)).

"In order to survive a motion for summary judgment, "the evidence rebutting the presumption of probable cause must be "sufficient for a reasonable jury to find that [the] indictment was procured as a result of police conduct undertaken in bad faith."  *Savino*, 331 F.3d

21

at 73; *see id.* (explaining that "[t]he District Court erroneously shifted this burden to defendants by permitting [the plaintiff] to rebut the presumption of probable cause with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith") (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)).  "At summary judgment," however, a plaintiff is "entitled to rely on his own testimony to establish his malicious prosecution claim" and is not required "to produce independent evidence that the defendants lied to prosecutors."  *Rentas v. Ruffin*, 816 F.3d 214, 221 (2d Cir. 2016); *cf. Ortiz v. Stambach*, 137 F.4th 48, 62 (2d Cir. 2025) (noting, in a case where the plaintiff could not "remember his interaction" with defendant detective, that "the law does not require a [§ 1983 malicious prosecution] plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence, and, thus, a plaintiff may do so entirely through circumstantial evidence").

Here, the indictment alleges that the underlying conduct occurred on the date of Plaintiff's 2020 detention.  Exhibit I to Mead Decl. at 2, Dkt. No. 47-10.  The indictment also contains two charges: criminal possession of a controlled substance in the third degree and criminal possession of a controlled substance in the fourth degree, N.Y. Penal Law §§ 220.09(1), 220.16(1).  Def. Stat. ¶ 66; Exhibit I to Mead Decl. at 2.  It therefore appears that the indictment relied on the cocaine allegedly seized at the barracks.

Plaintiff has therefore presented evidence that would allow a reasonable jury to infer that his indictment was secured through bad faith conduct.  Specifically, Plaintiff testified at the state trial that "nothing came out," he "didn't have nothing to take," and he "didn't have no drugs on" him.  Dkt. No. 51-8 at 28:13–25; *see also id.* at 37:4–9 (confirming that he did not have any drugs

22

on him at all that day). At Plaintiff's deposition in this action he also testified that he did not possess any drugs and that no drugs were recovered from his person at the barracks. Exhibit O to Mead Decl. at 120:21–121:2, Dkt. No. 47-16; Pl. Stat. ¶¶ 16–18. As a result, Plaintiff has consistently testified that the defendants did not recover cocaine from him after a strip search at the barracks. This is sufficient for his malicious prosecution claim to survive summary judgment. *Cf. Bellamy v. City of New York*, 914 F.3d 727, 746–47 (2d Cir. 2019) (explaining that "a § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact" and concluding that Plaintiff "raised a material issue of fact as to whether [a detective] fabricated [a] note" allegedly recording a statement that plaintiff made, where plaintiff's "testimony was consistent and uncomplicated: he never made the statement."). Furthermore, contrary to Defendants' argument, Plaintiff may rely on his own testimony. *See Rentas*, 816 F.3d at 221 (explaining that "[a]t summary judgment, [plaintiff] was entitled to rely on his own testimony to establish his malicious prosecution claim"). To the extent that Defendants rely on contrary statements in *Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 273–74 (S.D.N.Y. 2010) and *Watson v. Grady*, No. 09-cv-3055, 2015 WL 2168189 (S.D.N.Y. May 7, 2015), *aff'd sub nom. on other grounds Watson v. Sims*, 648 F. App'x 49 (2d Cir. 2016), those decisions were issued before *Rentas* was issued in 2016.

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendants did not actually seize the cocaine supporting the indictment from Plaintiff, and this would be "sufficient for a reasonable jury to find that [the] indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. Accordingly, summary judgment is denied on this basis.

23

b. **Initiation**

Defendants also argue that Tashjian did not initiate Plaintiff's prosecution because he was not involved in Plaintiff's case after the 2020 detention other than his grand jury preparation and testimony, and he has absolute immunity for those actions.  Def. Mem. 25–27.  Plaintiff responds that Tashjian initiated the prosecution when Defendants "falsely claimed to have found a bag of narcotics," Tashjian initialed "police reports and evidence vouchers" that Moffatt sent to the prosecutor, and Tashjian met with the prosecutor before his grand jury testimony.  Pl. Mem. at 21.  Defendants reply that "initialing a document that forwards evidence to a crime lab does not rise to the level of personal involvement for a Fourth Amendment malicious prosecution claim."  Reply at 16.

To initiate a criminal proceeding, the defendant must "play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Rohman v. NY.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) (quotation and citation omitted).  Even where "charges were added by" a prosecutor, and not "directly filed" by a police officer, "a jury could find that" the police officer "played a role in initiating the prosecution by preparing allegedly fabricated evidence and forwarding it to prosecutors." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997).  In other words, "[c]ourts have found a triable issue of fact as to the initiation element where the defendant-officer . . . created false information and forwarded it to prosecutors." *Alcantara v. City of N.Y.*, 646 F. Supp. 2d 449, 457–58 (S.D.N.Y. 2009) (quotation and citation omitted).  Initiation may occur even where a police officer did not directly forward evidence if his actions caused the prosecution. *See Phelps v. City of New York*, No. 04-cv-8570, 2006 WL 1749528, at *4 (S.D.N.Y. June 27, 2006) ("For a police officer to be held

24

responsible for malicious prosecution, however, his role need not be so direct. Instead, his actions must *cause* the initiation of criminal process against the plaintiff.") (citing *Sykes v. James*, 13 F.3d 515, 520 (2d Cir. 1993)); *see Maldonado v. City of New York*, No. 11-cv-3514, 2014 WL 787814, at *7 (S.D.N.Y. Feb. 26, 2014) (concluding that there was a genuine disputed material fact "as to whether the 'initiation' element of [the plaintiff's] malicious prosecution claim [was] satisfied" where a "rational jury could credit [the plaintiff's] version of events and, therefore, conclude that [he] was not selling heroin," and the defendant told the arresting officer that plaintiff gave heroin to another person).

Grand jury witnesses, including law enforcement officers, have "absolute immunity from any § 1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). This is true even when "that testimony is perjurious." *Coggins v. Buonora*, 776 F.3d 108, 112 (2d Cir. 2015). Therefore, "[w]hen a police officer claims absolute immunity for his grand jury testimony under *Rehberg*, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony." *Id.* at 113. "If the claim exists independently of the grand jury testimony," then the officer is not entitled to absolute immunity from the suit. *Id.* If, however, "the claim requires the grand jury testimony, the defendant enjoys absolute immunity." *Id.* The absolute immunity extends to "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony" to prosecutors. *Rehberg*, 566 U.S. at 370. Absolute immunity does not extend, however, to actions unrelated to grand jury testimony, such as making a knowing false statement in a report. *Coggins*, 776 F.3d at 113 (concluding that non-immune conduct included preparation of false "police reports" and "knowledge of the falsity of [another defendant's] police report).

25

At the outset, *Rehberg* requires that Tashjian's grand jury preparation and testimony not be considered.  The only remaining evidence of Tashjian's personal involvement in creating and forwarding false evidence to the prosecutor is that he allegedly initialed the evidence sheet prepared for the cocaine allegedly seized at the barracks after the visual body cavity search.  Dkt. No. 51-9.  Citing to the evidence sheet itself, Plaintiff asserts that Tashjian "initialed documentation that he had purportedly witnessed . . . Moffatt field test and weigh the crack cocaine" allegedly seized from Plaintiff at the barracks.  Pl. Resp. ¶ 61 (citing  Dkt. No.  51-9). Defendants respond that this is not sufficient to create a genuine disputed fact and point out that Plaintiff did not question either Defendant about the initials during their depositions.  Reply at 15–16.

The only potential reference to Tashjian on the evidence sheet is in the "transfer record" on the bottom.  Dkt. No. 51-9.  It states that "Inv. Moffatt" received the evidence from Defendant on February 11, 2020 at 1:00 p.m. and that on the same date at 3:00 p.m., "Inv. Moffatt" transferred it to an illegible person or entity.  *Id.*  Both entries for the receiving party's "signature" have illegible handwriting.  *Id.*

Although the evidence sheet does not have Tashjian's name on it, the handwriting in the signature boxes is not legible, and there is nothing about the illegible handwriting that would require a jury to conclude that they are not Tashjian's.  Given that Tashjian participated in the visual body cavity search and that after that search, Tashjian participated in the discussion with Plaintiff about whether he would be interested in becoming a confidential informant, a reasonable jury could infer that the illegible handwriting isa Tashjian's.  Def. Stat. ¶¶ 36, 50; Pl. Stat. ¶¶ 16, 19.  As a result, even though Plaintiff could have asked Defendants about this during their

depositions, given the ambiguity in the document itself, this is sufficient to create a genuine material disputed fact for the initiation element. If Tashjian initialed the sheet, and, as Plaintiff asserts, the cocaine was not seized from Plaintiff, then a reasonable jury could conclude that Tashjian signed a document with fabricated evidence and, based on Moffatt's report stating that "all case paperwork has been submitted" to the prosecutor, that the fabricated report was forwarded to a prosecutor. Accordingly, summary judgment is denied on Plaintiff's malicious prosecution claim against Tashjian.

### 4. Fair Trial Fabrication

Defendants argue that Tashjian is entitled to summary judgment on the fair trial claim because he did not forward the cocaine allegedly seized from Plaintiff to prosecutors. Def. Mem. at 28. Plaintiff responds that Tashjian's initials on the evidence sheet are sufficient to establish that he forwarded fabricated evidence. Pl. Mem. 22–23. Defendants reply that Plaintiff has not produced evidence that would allow a reasonable jury to conclude that Tashjian initialed the evidence sheet, and that initialing such a sheet is not sufficient personal involvement. Reply at 18.

"In a § 1983 suit alleging the denial of a fair trial because of fabricated evidence, a plaintiff must show that 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.'" *Davis-Guider v. City of Troy*, No. 23-589, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (alterations in original) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Like the initiation element in a malicious prosecution claim, the forwarding element in a fair trial claim does not require direct contact between the defendant and a prosecutor. *Cook v.*

27

*City of New York*, 243 F. Supp. 3d 332, 353 (E.D.N.Y. 2017) (granting a motion to amend to add a fair trial claim explaining that "plaintiffs do not have to allege that the . . . defendants directly communicated the allegedly false information to a prosecutor in order to state a claim for relief on the grounds that defendants fabricated evidence against them"); *Maldonado v. City of New York*, No. 11-cv-3514, 2014 WL 787814, at \*10 (S.D.N.Y. Feb. 26, 2014) (denying summary judgment on a fair trial claim where the defendant allegedly provided false information to another officer who shared that information with prosecutors).

As discussed above, given the ambiguity in the handwriting on the evidence sheet, there is a material disputed fact as to whether Tashjian initialed the sheet.  If Tashjian initialed the sheet, and, as Plaintiff asserts, the cocaine was not seized from Plaintiff, then a reasonable jury could find that the sheet would be likely to influence a jury's decision.  Accordingly, the motion is denied as to Plaintiff's fabrication claim against Tashjian.

### 5.  Failure to Intervene

Because the motion for summary judgment is granted on Plaintiff's false arrest claim, summary judgment will also be granted on Plaintiff's failure to intervene claim to the extent that it relies on Plaintiff's false arrest claim.  *See Levy v. City of New York*, 935 F. Supp. 2d 575, 594 (E.D.N.Y. 2013) (noting that a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim") (quotation and citation omitted).

### C.    Motion to Seal

Defendants filed an unopposed motion to seal documents from the criminal investigation and state court prosecution that were submitted in support of their summary judgment motion because those documents were sealed by the state trial court and contain personal, sensitive, and

28

confidential information.  Dkt. No. 48 at 1.  Plaintiff did not file any response.

Rule 5.3 of the Local Rules of Practice for the Northern District of New York requires a "party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard."  Courts in the Second Circuit use a three-step process to determine whether a document may be sealed.  *See Lugosch v. Pyramid Corp. of Onondaga Cnty.*, 435 F.3d 110, 119–20 (2d Cir. 2006).  First, the court must determine whether the documents are "judicial documents" to which a presumption of access attaches.  *Id.* at 119.  A "judicial document" is a document which is "relevant to the performance of the judicial function and useful in the judicial process."  *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995).  Second, if the subject documents are judicial documents, the court must then determine the weight of presumption of access.  *Lugosch*, 435 F.3d at 119.  The presumption of access is stronger when the document at issue involves the adjudication of the litigants' substantive rights.  *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995).  The presumption weakens "where the filing with the court is unusual or generally under seal."  *Id.* at 1050.  Third, the court balances "competing considerations" against the weight of presumption of access.  *Lugosch*, 435 F.3d at 120 (quotation and citation omitted).  Such considerations include "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure."  *Amodeo*, 71 F.3d at 1050–51.

Here, the documents are judicial documents because they were submitted in support of a motion for summary judgment, and there is a strong presumption of access.  *See Brown v. Maxwell*, 929 F.3d 41, 48 (2d Cir. 2019) (holding district court erred when if did not "give proper weight to

the presumption of access that attaches to documents filed in connection with summary judgment motions"). However, the articulated interests—that the documents contain personal, sensitive and confidential information and were ordered sealed by a New York state court, Dkt. No. 48 at 1—outweigh even the strong presumption of access. *Amodeo*, 71 F.3d at 1050–51.

As a result,  Defendants' motion to seal is granted.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion to file a surreply, Dkt. No. 55, is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that Plaintiff's motion is accepted as a surreply to the extent that it clarifies that Dkt. No. 51-5 was produced in discovery, but **DENIED** in all other respects; and it is further;

**ORDERED** that Defendants' motion for partial summary judgment, Dkt. No. 47, is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment is **GRANTED** as to Plaintiff's false arrest claims, which are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment is in all other respects **DENIED,** and it is further

**ORDERED** that the following claims shall proceed to trial: (1) Plaintiff's unlawful search claim against both Defendants, (2) Plaintiff's malicious prosecution claim against both Defendants, (3) Plaintiff's fair trial claim against both Defendants, and (4) Plaintiff's failure to intervene claim against both Defendants to the extent that it relies on surviving primary claims; and it is further

**ORDERED** that Defendants' motion to seal, Dkt. No. 48, is **GRANTED**; and the following exhibits attached to the Declaration of Erin Mead, Dkt. No. 47-1, should be submitted under seal: Dkt. Nos. 47-2 through 47-14 (Exhibits A through M).

Dated: March 31, 2026

Elizabeth C. Coombe
U.S. District Judge

31